**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GREGORIO CARMONA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 cv 462 |
| | ) | |
| CITY OF CHICAGO et al., | ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFF'S MEMORANUDM IN OPPOSITION TO
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

Plaintiff, Gregorio Carmona, by and through his attorneys, Anthony J. Peraica &

Associates, Ltd., pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, hereby

submits his memorandum of law in opposition to Defendants' Joint Motion for Summary

Judgment.

Because the defendants skew the facts in a bias and argumentative manner as oppose to a

neutral rendition as required under Rule 56, Plaintiff sets forth his own summary of the facts.

**SUMMARY OF FACTS**

On the evening of January 16, 2013, a fire broke out at 4831 North Kenneth Avenue in

the City of Chicago. The building was an apartment building with residences in the basement, 1st

floor and 2nd floor of the building. The fire started in the basement of the building. The basement

apartment was the home of Gregorio Carmona, Claudia Martinez-Rayo and their daughter, Erica

Carmona. There were other residents in the other two units in the building.

The fire department was called to put out the fire. At the time the fire department arrive,

Gregorio Carmona and other neighbors were attempting to enter the residence to locate Claudia

Martinez-Rayo but were prevented from doing so due to heavy smoke. The firefighters were able

1

to locate Claudia. It took two firefighters to bring Claudia out of the building and one of the firefighter's trip twice on his way out with Claudia.

The Chicago Police Department also arrived at the scene, initially to secure the area to allow emergency vehicles access to the fire. Upon extinguishment of the fire, the police took over to investigate the cause of the fire.

Ambulances transported Gregorio Carmona, Claudia Martinez-Rayo and their daughter, Erica Carmona to Swedish Memorial Hospital. Gregorio Carmona and his daughter were examined and treated for smoke inhalation at Swedish Memorial Hospital. Claudia Martinez-Rayo's injuries were more severe and she was transported to Loyola Hospital for further treatment. On January 17, 2013, Claudia Martinez-Rayo passed away at Loyola Hospital. Claudia Martinez-Rayo's body was transported to the Cook County Medical Examiner's office at the request of the Chicago Police Department for an autopsy.

The police began their investigation on two fronts after the fire was extinguished. They investigated the cause of the fire and determined it was arson and since Claudia had passed away, they also investigated for homicide.

Gregorio Carmona was the main suspect from the beginning. Firefighters acused him of starting the fire because he and his daughter made it out safely. Police continuous questioned him at the hospital about what occurred and who would want to hurt Claudia. The Police contacted DCFS and broke the family apart at a devestating time when Claudia died and the police took Carmona from the hospital to the police department and arrested him. In less than 48 hours from the time of the fire, the Chicago Police Department had Carmona in custody. Thereafter, the investigation focused on gathering evidence to support the charges against Carmona and ignore matters that did not support it.

Gregorio Carmona was incarcerated from his arrest on January 18, 2013 until he was released and exonerated of all charges on June 12, 2017. Judge Howard found "the State's case is resting on a thin lead and that is because the State's case is resting on the testimony of this six-year-old girl at the time of the incident. There is no corroboration for what happened whatsoever. . . . You have no statements from the Defendant. You have no indication that gas was found on his hands, and given the amount of gasoline that was poured on the floor, on the mattress and on the victim, it just seems unlikely that he could have done that and not spilled any on his hands, particularly when the firefighter said that his hands were sooty when they did the swab." PSOF ¶80. Judge Howard entered a judgment of acquittal. PSOF ¶81.

## STANDARD OF REVIEW

Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Bekker v. Humana Health Plan, Inc.*, 229 F. 3d 662, 669 (7th Cir. 2000). A genuine issue of fact exists only when a reasonable jury could find for the nonmoving party based on the record as a whole. *Bekker v. Humana Health Plan, Inc.*, 229 F. 3d 662, 669 (7th Cir. 2000). The court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weight the evidence. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2110 (2000); *EEOC v. Sears Roebuck & Co.*, 233 F. 3d 432, 436 (7th Cir. 2000). Courts do not make "credibility determinations nor choose between competing inferences" at the summary judgment stage. *Sarsha v. Sears Roebuck & Co.,* 3 F. 3d 035, 1041 (7th Cir. 1993).

Summary judgment cannot be granted if there is a genuine issue of material fact. Substantive law identifies what facts are material. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). "It is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-249 (1986) (citing *First National Bank of Arizona v. Cities Services Co*., 391 U.S. 253, 288-289 (1968)).

## ARGUMENT

I.  CAUSES OF ACTION NOT RAISED IN DEFENDANTS' SUMMARY JUDGMENT MOTION AND THEREFORE WAIVED.

Defendants' by failing to include argument with regard to Neil Francis, Tracy Fanning, Daniel Jacobs, Cesar Guzman, Jose Garcia and Fred Schall on the counts for unlawful arrest (Count I), due process (Count II), conspiracy (Count III), and malicious prosecution (Count VI), they have waived the ability to do so and thereby concede that litigation should go forward as to these individuals and those causes of action.

II.  DEFENDANTS JONES, ZYGOWICZ, REPPEN AND ORTON ARE PART OF THE CONSPIRACY TO DEPRIVE PLAINTIFF OF HIS CONSTITUTIONAL RIGHTS AND THEREFORE SUMMARY JUDGMENT SHOULD BE DENIED.

Defendants Ronald Jones, Peter Zygowicz, Kevin Reppen and John Orton were participants in the investigation of Gregorio Carmona and their actions and reports were a basis for the arrest and constitutional violations of Gregorio Carmona.

"Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a §1983 action unless he caused or participated in an alleged constitutional deprivation." *Wolf-Little v. Sonquist*, 699 F. 2d 864, 869 (1983). The

constitutional deprivations Carmona alleges are violations of the 4th, 5th, 6th and 14th Amendments. PSOF ¶82.

There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interest as to trigger the full protection of the Fourth and Fourteenth Amendments. *Hayes v. Florida*, 470 U.S. 811, 815-816, 105 S.Ct. 1643 (1985). The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, *Ker v. California*, 374 U.S. 23, 30, 83 S.Ct. 1623 (1963), provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated."

Seizures are sufficiently like arrests to invoke the traditional rule that arrest may be made only on probable cause. *Id.* An arrest occurs when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. *United States v. Ienco*, 182 F. 3d 517, 523 (7th Cir. 1999). "A person has been seized [arrested] within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 544, 100 S.Ct. 1870 (1980). "A seizure of property occurs when there is some meaningful interference with an individual's possessory interest in that property." *Soldal v. Cook County*, 506 U.S. 56, 61, 113 S.Ct. 538 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652 (1984)).

While Defendants Jones, Zygowicz, Reppen and Orton where not the actual officers who performed the physical arrest of Gregorio Carmona on January 18, 2013, they are not without liability. The Defendants Jones, Zygowicz, Reppen and Orton had undertaken actions prior to the

order to arrest Gregorio Carmona, which caused or contributed to Carmona's arrest. *Jenkins v. Keating*, 147 F. 3d 577, 583-584 (1998).

     A.  Defendant Ronald Jones' Involvement

Ronald Jones has worked for the Chicago Police Department for approximately 24 years. PSOF ⁋83. In January 2013, Jones was assigned to the first watch (2330 to 0530 hours or 11:30pm to 5:30am) for the 17th District in Chicago. PSOF ⁋83.

Defendant Jones was assigned to report to the fire on January 16, 2013. DSOF ¶42. One of the individuals Jones spoke to at the scene of the fire was the Plaintiff Gregorio Carmona, through a translator. PSOF ⁋84. Defendant Jones failed to record his conversation with Mr. Carmona in a report but recorded conversations had with nearby witnesses. PSOF ⁋86. Jones also spoke with the fire officials. PSOF ⁋84. Detective and Sergeant on the case were with Jones when he filled out the original report and they told him how to categorize the incident. PSOF ⁋85. The supplemental report prepared by Jones about the conversations had with witnesses was prepared the following day, on January 17, 2013. PSOF ⁋86.

According to the Supplementary Report HW120241, Jones was the paper car for the fire investigation. PSOF ⁋87. Zygowicz testified that the paper car is responsible for securing the scene, gathering witnesses, calling the sergeant, detectives and others to be notified, and then preparing the report. PSOF ⁋88. The detectives take over after the initial report is prepared and provided to them. PSOF ⁋88.

Although the Chicago Police Department does not require the officers to take courses, Defendant Jones took classes which include the following: Crime Scene Management, Limited English Proficiency, Making the Right Decisions, Police and Fire Scene Awareness, PAX 501 Legal Handbook, CPD Field Intelligence Procedures, Emergency Response-Life Saving

Decision, Fire Related Investigations, Biased Based Policing, 4th Amendment Search and Seizure, and Crime Scene Processing. PSOF ¶89.

Defendant Jones is personally liable to Gregorio Carmona under 42 U.S.C. §1983 for his involvement in the preparation of the initial police report (the initiating document for the investigation); it is part of the investigative file on which the other defendants' rely for their investigation. Defendant Jones' report (DSOF ¶45), subsequent report (DSOF ¶45) and lack of report on his conversation with Carmona at the scene are the foundation of the investigation. Defendant Jones cannot claim ignorance of his role and the importance of what he records or does not record because he has received training in matters involved in this case.

B. Defendant Peter Zygowicz's Involvement

Defendant Peter Zygowicz is a former officer with the Chicago Police Department from November 1996 to January 2017. PSOF ¶90. He was assigned to do parameter at the scene of the fire and then went with his partner to the hospital. DSOF ¶50. Peter Zygowicz did not enter Mr. Carmona's hospital room but remained outside the hospital room door. DSOF ¶52. Zygowicz recalls Detective Fanning being present in Carmona's hospital room. PSOF ¶90. His partner Zalinski did the report for the both of them. PSOF ¶90.

Defendant Zygowicz is personally liable to Gregorio Carmona under 42 U.S.C. §1983 for his role in detaining (i.e. seizing) Mr. Carmona. Defendant Zygowicz remained outside the hospital room of Gregorio Carmona preventing others from entering and Carmona from leaving. DSOF ¶50. Raymundo Carmona testified that there were officers outside of Gregorio Carmona's hospital room that told him he could not see Gregorio Carmona. PSOF ¶91. Elena Perez also testified that there was police outside Carmona's hospital room, so you could not go in. PSOF ¶92. Carmona also knew that Defendant Zygowicz was outside of his hospital room because he

testified that "four or five people were inside the room. Outside the room was a police officer because you could see the feet of the chair and the shoes of the police officer and also the pants." PSOF ¶93. It can be inferred that Gregorio Carmona knew that he would not be able to leave with Defendant Zygowicz outside his hospital room.

This seizure of Carmona was unreasonable given that he was currently in a hospital under medical care, his residence was on fire, he was separated from his daughter, unaware of what happened to his girlfriend, and was subject to multiple rounds of questioning by numerous police officers. Defendant Zygowicz should not be allowed to discount his actions and escape liability for his role in seizing Gregorio Carmona's person and assisting in gathering evidence and statements of Gregorio Carmona at the hospital.

C. Defendant Kevin Reppen's Involvement

Defendant Kevin Reppen was employed by the Chicago Police Department from June of 1986 and has risen through the ranks to Lieutenant in May 2015. PSOF ¶94. At the time of the incident involved in this case, Reppen was a Sergeant. PSOF ¶94. As a Sergeant in January 2013, he supervised 19 detectives, including Tracy Fanning, Mark Regal, Ed Heerdt, George Gonzalez and Tom Conley (whose names appear in the reports related to this case), and other police officers in Area North. PSOF ¶94. Reppen was the only Sergeant for the 1st watch in Area North. PSOF ¶95.

Reppen as a sergeant supervisor would generally assign detectives to conduct the investigation, communicate with supervisors and members of the homicide team, make observations, ask questions, gather information, ensure reports are completed and submitted, and instruct people to canvass building or check for video or run license plates or "to conduct any number of police functions that I thought were necessary." PSOF ¶95. Reppen assigned the

detectives involved in this investigation and he himself went to the scene. PSOF ¶96. At the scene of the apartment fire, Reppen consulted with Detectives Fanning, Regal, Heerdt, and Schall. PSOF ¶96. Reppen directed Detectives Regal and Heerdt to canvass local gas stations and they reported back there was nothing of evidentiary value. PSOF ¶96. Reppen authored the Major Incident Report on January 17, 2013. PSOF ¶96.

Reppen has undergone training on the 4th Amendment and recalls that the "modules would have covered such things as probable cause. They would have covered such things as warrants, expectations of privacy, exceptions to the warrant requirement. They would have covered the processes and procedures by which to obtain warrants." As far as Reppen is aware, he was required to take the 4th Amendment training and to the best of his knowledge so where other detectives. PSOF ¶97. Reppen also testified that there are department directives related to the requirement of probable cause, proper treatment of witnesses, communication to witnesses that they are free to leave, reasonable suspicion, reasonable articulable suspicion, temporary detention, and arrest. PSOF ¶98.

Defendant Reppen is personally liable to Gregorio Carmona under 42 U.S.C. §1983 for causing and contributing to information used to arrest Gregorio Carmona. He authored a report and he supervised and directed Defendant Detectives as to how to conduct the investigation.

Not only did Reppen's actions on January 17, 2013 cause the arrest of Gregorio Carmona, but he also turned a blind eye, as the detectives he supervised, made Gregorio Carmona the suspect.  An officer can be liable for failure to intervene if that officer "(1) had reason to know that a citizen was unjustifiably arrested, and (2) had a realistic opportunity to intervene to prevent that harm from occurring." *Yang v. Hardin*, 37 F. 3d 282, 285 (7th Cir. 1994). Reppen testified that in 2013 his main role was "to assign and to monitor the progress of

the follow up investigations that were initiated after preliminary investigations were conducted by patrol officers." PSOF ₱99.

Reppen admitted that the detectives involved in this case reported back to him. PSOF ₱99. Reppen had supervisory control over the defendant detectives. Supervisory liability may attach where a supervisor, with knowledge of a subordinate's conduct, approves of the conduct and the basis for it. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 926 (1988); *Florenzo v. Nolan*, 965 F. 2d 348, 351 (7th Cir. 1992); *Jones v. City of Chicago*, 856 F. 2d 985, 992 (7th Cir. 1992) ("the supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.") Given the limitation of Defendants' summary judgment motion (see Section I above) and several of the defendant detectives being supervised by Reppen remain in the litigation, summary judgment should be denied.

### D. Defendant John Orton's Involvement

Orton is a former police officer with the Chicago Police Department of which he was a member from November 29, 1982 until May 15, 2015. PSOF ₱100. In January 2013, he was working in Case Management for Area North. DSOF ₱61. His job was to read case reports and code them and assign jobs to detectives electronically. DSOF ₱62. And one of the things he did as an Administrative Detective is to make sure it was classified correctly. DSOF ₱62 and ₱64. His only job was to read the case report and see if the facts went along with the classification. DSOF ₱64.

Defendant Orton is personally liable to Gregorio Carmona under 42 U.S.C. §1983 for his causing the investigation to be classified as an arson and homicide. Defendant Orton should not

be allowed to claim ignorance of his role and the importance of what he classifies as a crime and what classifications he assigns to matters.

Contrary to the Defendants' arguments for Defendants Kevin Reppen, Peter Zygowicz, Ronald Jones and John Orton lacking personal involvement, each of them had a role in the investigation and conspiracy (set forth in Count III) that led to Mr. Carmona's arrest, detention and incarceration. Therefore, summary judgment as to them should be denied.

Not only did the investigative efforts and documents of the Defendants cause or contribute to Gregorio Carmona's  arrest, but they were also part of the conspiracy to charge Mr. Carmona with arson and murder. To prevail on a conspiracy claim, "the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F. 3d 500, 510 (7th Cir. 2015). Carmona must show an underlying constitutional violation and demonstrate that the defendants agreed to inflict the constitutional harm. *Hurt v. Wise*, 880 F. 3d 831, 842 (7th Cir. 2018).

Defendants Jones, Zygowicz, Reppen and Orton were part of the conspiracy to arrest Carmona because they were collectively (and with other officers) assigned to participate in the investigations in the battery/homicide and arson that occurred on January 16, 2013 at 4831 North Kenneth. The Chicago Police Department issued an arrest for Gregorio Carmona less than 2 days after the occurrence. The Chicago Police Department brought the evidence they recovered to the Assistant State's Attorney to arrest and bring charges against Gregorio Carmona. Gregorio Carmona was incarcerated from January 18, 2013 until June 12, 2017, when he was exonerated from all charges and freed. Plaintiff has evidence to support his claims for conspiracy that at least rise to the level of issues of material fact that precludes summary judgment.

III.    DEFENDANTS JONES, ZYGOWICZ, REPPEN AND ORTON ARE PART OF
        THE CONSPIRACY OF MALICIOUS PROSECUTION OF THE PLAINTIFF AND
        THEREFORE SUMMARY JUDGMENT SHOULD BE DENIED.

In order to establish a malicious prosecution action, the plaintiff must prove "(1) the

commencement or continuance of an original criminal or civil judicial proceeding by the

defendant, (2) the termination of the proceeding in favor of the plaintiff, (3) the absence of

probable cause for such proceeding, (4) the presence of malice; and (5) damages resulting to the

plaintiff." *Joiner v. Benton Community Bank*, 82 Ill. 2d 40, 45, 411 N.E.2d 229 (1980) (quoting

*Ritchey v. Maksin*, 71 Ill. 2d 470, 475, 376 N.E.2d 991 (1978)). "Liability for malicious criminal

prosecution in not confined to situations where the defendant signed a complaint against the

plaintiff. Rather, liability extends to all persons who played a significant role in causing the

prosecution of the plaintiff, provided all of the elements of the tort are present." *Rodgers v.

Peoples Gas Light & Coke Co.*, 315 Ill. App. 3d 340, 348-349 (2000) (citing *Frye v. O'Neill*, 166

Ill. App. 3d 963, 975, 520 N.E.2d 1233 (1988); 54 C.J.S. Malicious Prosecution §§18, 19

(1987)).

Plaintiff can prove his claim for malicious prosecution. Plaintiff satisfies the first element

because there was a criminal case filed against the Plaintiff, *People v. Gregorio Carmona*, 13 CR

03753. Plaintiff satisfies the second element because on June 12, 2017, Judge Howard ruled the

State failed to meet its burden in the criminal matter and entered judgment of not guilty in favor

of Gregorio Carmona. DSOF ¶33.

Plaintiff raises an issue of material fact as to whether probable cause, the third element,

was present. Probable cause is a fluctuating concept; its existence depends upon "factual and

practical considerations of everyday life." *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317,

2328 (1983) (quoting *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310 (1949)).

It is the totality of circumstances, including the facts available to defendant, that are dispositive. *Gates,* 462 U.S. at 231-32, 103 S.Ct. at 2328-29; *United States v. Fooladi,* 703 F. 2d 180 (5th Cir.1983). Probable cause is a determination for the jury, unless there is no material facts in dispute, then a court may decide. *Stokes v. Board of Education of the City of Chicago*, 599 F. 3d 617, 623 (2010).

Probable cause is "a state of facts . . . that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Mack v. First Security Bank*, 158 Ill. App. 3d 497, 502, 511 N.E.2d 714, 717 (1987). Both arson (720 ILCS 5/20-1) and homicide (720 ILCS 5/9-1) are specific intent crimes.

Plaintiff contends that Defendants failed to investigate the occurrence. The Defendants rushed to arrest Gregorio Carmona less than 48 hours after the fire and then built their case against him, without consideration of witness testimony and evidence to the contrary. A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. *BeVier v. Hucal*, 806 F. 2d 123 (1986). Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place.

The Defendants did not follow up on all of the leads and information that they were provided before jumping to the conclusion that Gregorio Carmona did it. One of the residents told investigators that the washer and dryer in the building was not working properly. PSOF ¶101. No testing or further inquiry was made into the washer and dryer by the Chicago Police Department. There was gang graffiti outside the building a few days after the fire but no investigation was entered by the Chicago Police Department to determine its role. PSOF ¶102. The Chicago Police Department took Plaintiff's photograph (and no one else's photograph) around to the area gas stations but no one recognized the Plaintiff as having purchased a gas can.

PSOF ⁋103. Nora Fernandez testified that Carmona did not have anything but his daughter with him exiting the burning building. PSOF ⁋104. Gregorio Carmona's hands were tested and he did not have any gasoline on them. PSOF ⁋105.It does not appear that Defendants considered the possibility that the decedent caused the fire. PSOF ⁋106. Defendants did not have probable cause to arrest, detain or prosecute Gregorio Carmona.

The fourth element, malice, is also present. "Malice, as an element of malicious prosecution, does not necessarily mean personal ill-will, spite or hatred toward the person prosecuted, but is proved by showing that the prosecutor was actuated by improper motives." *Glenn v. Lawrence*, 280 Ill. 581, 586, 117 N.E. 757 (1917). Gregorio Carmona testified that at the hospital a firefighter repeatedly accused of the fire and angrily asked by him "Why did you do it? . . . You did it. . . . Why you do it?" (, in the presence of police officers. PSOF ⁋107. Officers acted with ill-will in questioning Carmona at the hospital by speaking in English and saying that he started the fire and another told him they were going to put him in jail forever. PSOF ⁋108. Officer Garcia made rude comments to Carmona at the hospital that he could do whatever he wanted and "I'm going to help you. Tell me that you did it, and then I'll help you to get less time. I'll give you less time in jail." PSOF ⁋108. He was called a drug trafficker because he has a nice car. PSOF ⁋108. Officer Garcia also "got so close to me I thought he was going to hit me." PSOF ⁋108. The name calling and pressure continued to be placed on Gregorio Carmona after he left the hospital and was transferred to the police station where he was placed in a small room under surveillance for hours.

Gregorio Carmona sustained many damages as a result of the arrest, incarceration and wrongful conviction. He lost income of approximately $30,000 a year. PSOF ⁋109. He lost a property, 2336 Marmora Avenue, that he owned because he could not make payments on it while

incarcerated. PSOF ⁋109. He lost $7,500 in cash and jewelry that was not recovered from the residence after the fire. PSOF ⁋109. Property was removed from his vehicle, including a sound system, soccer clothing, CDs, movies, mechanical tools, personal clothes and other items. PSOF ⁋109. In addition to the material damages, Carmona suffered emotional damages being subjected to handcuffs to the bed, over 4 and a half years in jail for something he did not do, no contact with his daughter for almost 5 years and now only once a week supervised, and medication for depression in jail. PSOF ⁋110.

For all of the reasons above and contained in the court records, summary judgment the malicious prosecution cause of action should be denied.

## IV.  THERE ARE ISSUES OF MATERIAL FACT THAT PRECLUDE SUMMARY JUDGMENT FOR DEFENDANT EDWIN DANTES.

Defendant Dantes was involved in the investigation and conspiracy that lead to charges being filed against Mr. Carmona, so he cannot claim lack of personal involvement. Furthermore, qualified immunity does not apply to the actions of Defendant Dantes and therefore summary judgment should be denied.

As set forth above, "Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An individual cannot be held liable in a §1983 action unless he caused or participated in an alleged constitutional deprivation." *Wolf-Little v. Sonquist*, 699 F. 2d 864, 869 (1983).

Edwin Dantes worked for the Chicago Police Department from March 1990 until December 2016. PSOF ⁋111. When he became involved in the investigation involving Gregorio Carmona on January 17, 2013, Carmona was a person of interest in the arson fire at his residence. PSOF ⁋111. Dantes executed a search warrant complaint for Gregorio Carmona's vehicle. PSOF ⁋112. The information contained within the search warrant was not obtained by

15

Dantes' personal knowledge or observation but through other officers. PSOF ℙ112. Dantes determined that since the vehicle was in Gregorio Carmona's name and "[h]is house burned down, and this is where logically any evidence could be.", but he also learned about the vehicle through other officers. PSOF ℙ112. "I trust the detectives I worked with. . . .what they tell me I take as the truth." PSOF ℙ112. He took an oath in court of the truth of the contents of the search warrant, even though he did not have first-hand knowledge of the facts. PSOF ℙ113. The judge did not ask him any questions and he did not discuss the contents of the search warrant with the State's Attorney. PSOF ℙ113. After obtaining the search warrant, he executed it on Gregorio Carmona's vehicle. PSOF ℙ113. Dantes also went to Swedish Covenant to inquire as to Gregorio Carmona's condition on January 17, 2013, canvassed the area, spoke to gas station employees, transported Edwin Santos to the police station, and continued to help with the investigation until January 19, 2013. PSOF ℙ114. The search warrant that Edwin Dantes obtained was quashed in the criminal proceeding, *People v. Gregorio Carmona*, 13 CR 03753.

Contrary to the Defendants' arguments for Defendant Edwin Dantes lacking personal involvement (but admitting his involvement in obtaining a search warrant), he had a role in the investigation and conspiracy (set forth in Count III) that led to Mr. Carmona's arrest, detention and incarceration. Therefore, summary judgment should be denied.

Defendant Dantes attempts to hide behind the affirmative defense of qualified immunity (which was not raised in the other defendants' arguments). Qualified immunity does not apply. The qualified immunity doctrine does not protect those who act unreasonably or "who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct.534 (1991). Qualified immunity is, as the term implies, qualified. It contemplates instances in which a public official's actions are not protected because the official knew or should have known he was violating an

individual's constitutional rights. *See Butz v. Economou,* 438 U.S. 478, 506-507, 98 S.Ct. 2894 (1978) ("[I]t is not unfair to hold liable the official who knows or should know he is acting outside the law, and that insisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment."). Both the federal and state constitutions protect citizens from unreasonable searches and seizures. U.S. Const. Amend. IV; Ill. Const. 1970, Art. I, Sec. 6. Dantes is well aware that the as a police officer he is subject to the federal and state constitutions. Exhibit 15: Dante Dep. p. 43-44.

Dantes did not in good faith determine the validity of what was on the search warrant that he signed. Furthermore, since neither the State's Attorney nor the Judge asked Dantes questions about the search warrant, defendant Dantes cannot rely on them validating "probable cause", especially in light of Ill. R. Evid. 602 (eff. Jan. 1, 2011), which states "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness ahs personal knowledge of the matter." It is clear that Dantes did not have any personal knowledge of the contents of the search warrant that he represented to be a witness to. "A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest." *BeVier v. Hucal*, 806 F. 2d 123, 128 (7th Cir. 1986). The burden of proving the affirmative defense of qualified immunity is on Defendant Dantes and he cannot meet his burden of proof. Therefore, Defendant Dantes' summary judgment motion should be denied.

V. PLAINTIFF SETS FORTH EVIDENCE OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS PRECLUDING SUMMARY JUDGMENT ON PLAINTIFF'S COUNT VIII.

In Illinois, the elements of intentional infliction of emotional distress are: "1. extreme and outrageous conduct, 2. intent by the defendant to cause or a reckless disregard of the probability of causing emotional distress, 3. severe or extreme emotional distress suffered by the

plaintiff, and 4. an actual and proximate causation of emotional distress by the defendant's outrageous conduct." *Tobias v. Winkler*, 156 Ill. App. 3d 886, 896 (1987).

Whether conduct is extreme and outrageous is evaluated on an objective standard based on all of the facts and circumstances. *McGrath v. Fahey*, 126 Ill. 2d 78, 90, 533 N.E.2d 806, 811 (1988). Liability only attaches in circumstances where the defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 90, 360 N.E.2d 765, 767 (1976) (quoting Restatement (Second) of Torts §46, Comment *d* (1965)).

"Plaintiff need not allege physical injury to recover for intentional infliction of emotional distress." *Knierim v. Izzo*, 22 Ill. 2d 73, 174 N.E.2d 157 (1961). According to *Leong v. Takasaki*, 55 Haw. 398, 411-412, 520 P. 2d 758, 766-767 (1975), there are two responses to traumatic stimuli: primary and secondary. The primary response is an immediate, automatic and instinctive response designed to protect the individual from harm. It is exemplified by emotional responses such as fear, anger, grief, and shock, and is generally short in duration and subjective in nature. The secondary responses, which may be characterized as traumatic neuroses, are longer lasting reactions that are caused by a person's inability to cope adequately with a traumatic event. This response often is divided into three frequently occurring forms of neurosis: (1) the anxiety reaction, which produces severe tension and can result in nervousness, weight loss, stomach pains, emotional fatigue, weakness, headaches, backaches, a sense of impending doom, irritability, or indecision; (2) conversation reaction, which converts consciously disowned impulses into paralysis, loss of hearing or sight, muscle spasms, or other physiological symptoms which cannot be explained by a physical impairment; and (3) hypochondrias reaction, characterized by an over concern with health, and a fear of illness.

18

The court in *Corgan v. Muehling*, 143 Ill. 2d 296 (1991), adopted the scientific research set forth in *Leong v. Takasaki* above and reasoned that "[t]he emotional distress of the primary response is no less real than the distress that is coupled with the physical manifestation of the secondary response and should not be distinguishable at law." *Corgan v. Muehling*, 143 Ill. 2d 296, 311 (1991). The absence of medical testimony does not preclude recovery for emotional distress. *Thorton v. Garcini*, 237 Ill. 2d 100, 108 (2010). "The existence or nonexistence of medical testimony goes to the weight of the evidence but does not prevent this issue from being submitted to the jury." *Clark v. Owens-Brockway Glass Container, Inc*., 297 Ill. App. 3d 694, 701, 697 N.E.2d 743 (1998); see also, *Thorton v. Garcini*, 237 Ill. 2d 100, 109 (2010).

As set forth above, Plaintiff was subjected to repetitive interrogative techniques in an attempt to break him into submission and confess to a crime he did not commit. Gregorio Carmona testified that at the hospital a firefighter repeatedly accused of the fire and angrily asked by him "Why did you do it? . . . You did it. . . . Why you do it?" (, in the presence of police officers. PSOF ℙ107. Officers acted with ill-will in questioning Carmona at the hospital by speaking in English and saying that he started the fire and another told him they were going to put him in jail forever. PSOF ℙ108. Officer Garcia made rude comments to Carmona at the hospital that he could do whatever he wanted and "I'm going to help you. Tell me that you did it, and then I'll help you to get less time. I'll give you less time in jail." PSOF ℙ108. He was called a drug trafficker because he has a nice car. PSOF ℙ108. Officer Garcia also "got so close to me I thought he was going to hit me." PSOF ℙ108. The name calling and pressure continued to be placed on Gregorio Carmona after he left the hospital and was transferred to the police station where he was placed in a small room under surveillance for hours.

Gregorio Carmona was further subject to extreme and outrageous conduct in being torn away from his family and daughter for over 4 and a half years and incarcerated. Carmona did not have to just endure the time, expense, stress and aggravation of a criminal trial but he had to do it emotionally alone. His girlfriend was deceased. His daughter was prevented from see him. PSOF ¶115. He was incarcerated for 4 and a half years, while the State built its case against Carmona. Yet, Judge Howard found "the State's case is resting on a thin lead and that is because the State's case is resting on the testimony of this six-year-old girl at the time of the incident. There is no corroboration for what happened whatsoever. . . . You have no statements from the Defendant. You have no indication that gas was found on his hands, and given the amount of gasoline that was poured on the floor, on the mattress and on the victim, it just seems unlikely that he could have done that and not spilled any on his hands, particularly when the firefighter said that his hands were sooty when they did the swab." not only for a crime that he did not commit." PSOF ¶80. The Defendants claim to have probable cause for their arrest, charging and prosecution of Gregorio Carmona but all they had was inconsistent and police-suggested statements from a then six year old, with no supporting evidence. They took 5 years from Carmona's life for that.

Interestingly, the Defendants argue that their individual actions do not rise to the let of willful and wanton conduct, yet when it came to Dantes' involvement in the search warrant their argument relied on the collective knowledge doctrine, but they fail to explain why the collective knowledge doctrine would not apply in the case of intentional emotional distress. Clearly there were several defendants who had it out for the Plaintiff but none of the other defendants checked them to ensure proper procedure or care if there was sufficient evidence supporting their theory.

As set forth in the arguments above, the depositions and documents presented in this case, the Defendants intentionally and with willful and wanton conduct deprived Gregorio Carmona of life, liberty and property without a proper basis. The Illinois Tort Immunity Act does not apply.

## **CONCLUSION**

Summary judgment cannot be granted because there are genuine issues of material fact which require a jury or judge to resolve the parties' differing versions of the truth at trial. The defendants are not entitled to summary judgment. Each defendant had a role and provided a piece of the investigation which led to the wrongful arrest, wrongful prosecution and constitutional deprivations faced by the Plaintiff, which intentionally cause Gregorio Carmona emotional distress.

Wherefore, Plaintiff, Gregorio Carmona respectfully requests that this Honorable Court deny the Defendants' motion for summary judgment, find that there are questions of material fact, set this matter for trial and for such further relief as this Court deems just.

Respectfully Submitted,

Gregorio Carmona

By: s/ Anthony J. Peraica

Anthony J. Peraica, ARDC #6186661
Anthony J. Peraica & Associates, Ltd.
5130 S. Archer Avenue
Chicago, Illinois 60632
(773) 735-1700