UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORIO CARMONA, | ) | |
| | ) | |
| Plaintiff, | ) | 15 C 462 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| CITY OF CHICAGO, TRACY FANNING, DANIEL | ) | |
| JACOBS, CESAR GUZMAN, JOSE GARCIA, FRED | ) | |
| SCHALL, RONALD JONES, JOHN ORTON, NEIL | ) | |
| FRANCIS, KEVIN REPPEN, PETER ZYGOWICZ, and | ) | |
| EDWIN DANTES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Gregorio Carmona brought this suit against the City of Chicago and several Chicago police officers, alleging that they violated his Fourth, Fifth, Sixth, and Fourteenth Amendment rights and committed state law torts in interrogating, investigating, arresting, and prosecuting him in connection with a fire that caused his girlfriend's death. The court dismissed the *Monell* claim against the City with prejudice under Civil Rule 12(b)(6), Doc. 97 (St. Eve, J.) (reported at 2018 WL 1468995 (N.D. Ill. Mar. 26, 2018)), and Carmona voluntarily dismissed his claims against two of the officers, Doc. 135. Trial on the remaining claims is set for November 2019. Doc. 145. Defendants move for partial summary judgment. Doc. 137. The motion is granted in part and denied in part.

## Background

The following facts are set forth as favorably to Carmona, the nonmovant, as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893

(7th Cir. 2018). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

Before setting forth the facts, the court addresses some preliminary evidentiary and Local Rule 56.1 issues. First, Carmona objects to several factual assertions in Defendants' Local Rule 56.1(a)(3) statement as "compound," "vague," or "confusing," but he does not support his objections with pertinent authority or developed argument. Doc. 155 at ¶¶ 1, 3-4, 8, 10, 12, 14, 16-18, 25, 30-31, 41, 47, 51, 54-56, 61, 65. Those objections accordingly are forfeited. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."). The objections fail on the merits in any event, as "compound" is an objection to form and thus provides no basis for disregarding a factual assertion on summary judgment, *see Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016) (holding that "[t]he evidence [presented at summary judgment] need not be admissible in form" as long as it could be presented in admissible form at trial); *see also* Fed. R. Civ. P. 56(c)(2) (same); *Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017) (same), and the challenged assertions are properly composed under Local Rule 56.1(a)(3).

Second, Defendants' hearsay and foundation objections to Carmona's use of unauthenticated police reports, Doc. 159 at ¶¶ 87, 101, 105, are sustained, as Carmona submits no evidence that the reports are what they purport to be, *see* Fed. R. Evid. 901, or that the requirements of the hearsay exception for business records are satisfied, *see* Fed. R. Evid. 803(6). *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 578 (7th Cir. 2015) (holding that the district court on summary judgment properly disregarded a document unaccompanied by an affidavit establishing that it met the business records exception, and rejecting the plaintiff's

argument that the defendant admitted the document's authenticity by producing it in discovery); *Estate of Brown v. Thomas*, 771 F.3d 1001, 1005-06 (7th Cir. 2014) (holding that the district court properly disregarded an unauthenticated report at summary judgment); *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000) (holding that, as a general rule, an unauthenticated police report is not properly considered on summary judgment). Accordingly, Carmona's assertions are disregarded insofar as they rely exclusively on unauthenticated police reports.

Finally, the court disregards Defendants' reply to Carmona's Local Rule 56.1(b)(3)(B) response, Doc. 159 at ¶¶ 1-79, as the local rules do not provide for a reply and Defendants did not move for leave to file one. *See Hall v. Vill. of Flossmoor Police Dep't*, 2012 WL 6021659, at *8 n.8 (N.D. Ill. Dec. 4, 2012) ("[Local Rule 56.1] permits movants to reply only to a Local Rule 56.1(b)(3)(C) statement, not a Local Rule 56.1(b)(3)(B) response."); *Johnson v. Cnty. of Cook*, 2012 WL 2905485, at *13 (N.D. Ill. July 26, 2012) (same).

On January 16, 2013, the basement apartment where Carmona lived with his girlfriend, Claudia Martinez-Rayo, and their daughter, Erica Carmona, caught fire with all three inside. Doc. 155 at ¶¶ 7-8. The police and fire departments responded, and all three were taken to Swedish Covenant Hospital, where Martinez-Rayo died. *Id*. at ¶¶ 9, 11-12. (Carmona's assertion that he was carrying only Erica when he left the apartment, Doc. 159 at ¶ 104, is disregarded because he supports the assertion by citing an entire deposition transcript rather than the pertinent page(s). *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004) (holding that Local Rule 56.1 requires parties to support their factual assertions with "a specific reference to the affidavit or other part of the record that supports such a denial," and that "[c]itations to an entire transcript of a deposition or to a lengthy exhibit are not specific and are … inappropriate").) Police opened two parallel investigations, one for aggravated arson and

the other for aggravated battery. Doc. 155 at ¶ 16. (Carmona's objection to Defendants'
assertion that police opened arson and battery investigations on the ground that it is a legal
conclusion, *ibid*., is overruled because how law enforcement classified the investigations is a
fact.) Detective John Orton would later review the aggravated arson and aggravated battery
classifications, ensure that the facts in the police reports justified the classifications, and
complete data entry related to the case. *Id*. at ¶¶ 61-64. Among the officers who responded to
the scene were Officer Ronald Jones, Lieutenant Kevin Reppen, Detective Edwin Dantes,
Officer Peter Zygowicz, and Officer Kimberly Zalinski. *Id*. at ¶¶ 41-79.

Jones spoke with several witnesses at the scene, including Carmona. *Id*. at ¶ 43. Jones
prepared two police reports that categorized the fire as an aggravated arson and listed Carmona
as a victim. *Id*. at ¶¶ 45-46. Jones had no further involvement in the investigation or further
interaction with Carmona. *Id*. at ¶¶ 47-48. (Carmona's objection to Defendants' assertion that
Jones had no further involvement in the investigation on the ground that it is a legal conclusion,
*ibid*., is overruled because the assertion is factual.)

Reppen, then a sergeant with nineteen detectives (including Tracy Fanning) under his
supervision, assigned a team to investigate the fire and joined them at the scene. *Id*. at ¶¶ 55-57;
Doc. 159 at ¶ 94. Reppen spoke with detectives and fire department personnel, told two officers
to canvas nearby gas stations, supervised the officers under his command, and authored part of a
major incident report. Doc. 155 at ¶ 59; Doc. 159 at ¶¶ 96, 99. At the end of his shift, Reppen
relayed the status of the investigation to the next shift supervisor. Doc. 155 at ¶ 58. Reppen had
no further involvement in the investigation or further interaction with Carmona. *Id*. at ¶ 60.

Dantes canvassed gas stations and local businesses to ask whether anyone had recently
pumped gas into a gas container and interviewed neighbors about whether they saw anything

suspicious or knew the burned building's occupants. *Id.* at ¶¶ 70-71. Dantes showed Carmona's picture at some gas stations and other businesses, but no business owner recalled Carmona purchasing a gas can. Doc. 159 at ¶ 103. (Defendants' objection that the cited material does not support Carmona's assertion that no business owner reported seeing him purchasing a gas can, *ibid.*, is overruled, as the assertion can reasonably be inferred from Dantes's deposition testimony.) Dantes also spoke with a nurse at Swedish Covenant Hospital to check on Carmona's condition. *Id.* at ¶ 114.

When Zygowicz first arrived at the scene, he was assigned to guard the perimeter. Doc. 155 at ¶ 50. He was then asked to follow an ambulance to Swedish Covenant Hospital with his partner Zalinski so that Zalinski could translate for Carmona. *Id.* at ¶¶ 50-51. Zygowicz was stationed outside the door of Carmona's hospital room and did not enter. *Id.* at ¶ 52. Carmona knew that an officer was seated outside because he could see the legs of a chair and an officer's shoes. Doc. 159 at ¶ 93. Carmona's brother Raymundo testified that officers outside the hospital room told him that he could not see Carmona. Doc. 159 at ¶ 91. (Carmona's assertion that Elena Perez also testified that officers prevented visitors from entering his room is disregarded, Doc. 159 at ¶ 92, because the cited material does not establish that she had personal knowledge of that fact, Doc. 156-13 at 14-15. *See* Fed. R. Evid. 602.)

While Zygowicz waited outside, five officers—Fanning, Detective Fred Schall, Neil Francis, Sergeant Jose Garcia, and Sergeant Cesar Guzman—questioned Carmona in his hospital room about the fire. Doc. 155 at ¶¶ 13-14. At that time, Carmona was considered a victim, not a suspect. *Id.* at ¶¶ 15-16, 46; Doc. 159 at ¶¶ 107-08. Erica was in the hospital room for part of the questioning, but she left the hospital with Raymundo before the questioning concluded. Doc. 155 at ¶¶ 18-19. During the questioning, one officer said he would put Carmona in jail forever.

Doc. 159 at ¶ 108. Garcia was rude to Carmona and got so close to him that he thought Garcia would hit him. *Ibid.* Garcia said that if Carmona confessed, the officers would help him get a lower sentence, and Garcia suggested that Carmona might be a drug trafficker because he had a nice car. *Ibid.* Carmona also heard the officers saying to one another in English that he had set the fire. *Ibid.*

At one point while Carmona was in the hospital, an unnamed firefighter repeatedly accused him of setting the fire and asked why he did it. *Id.* at ¶ 107. (Defendants' denial of Carmona's testimony about the firefighter's accusations is disregarded, *ibid.*, as police officers' statements that they considered Carmona a victim at that time do not contradict Carmona's assertion about what a firefighter said to him.) At another point, an unknown officer—not any of the Defendants—handcuffed Carmona to his hospital bed. Doc. 155 at ¶¶ 21-22. The parties' Local Rule 56.1 statements and responses do not reflect whether the events recounted in this paragraph happened before, after, or during the hospital room interrogation, and there is no record evidence indicating that any of the Defendants participated in or witnessed them.

The investigation continued while Carmona was in the hospital. *Id.* at ¶ 25. Investigators found traces of an accelerant and a gas can at the scene, determined that Martinez-Rayo and the bed in which she was lying had been doused with the accelerant, and identified what they believed to be "pour patterns." *Id.* at ¶¶ 10, 30. At the hospital, Carmona signed a form consenting to collection of evidence from his person, and Schall took swabs from his hands and clothing. *Id.* at ¶¶ 14, 22. (Although Carmona has not stated under oath that he did not understand the consent form, he argues that a reasonable jury could infer as much from his limited literacy and English language skills and Zalinski's poor Spanish translation. *Id.* at ¶ 14. According to Carmona, Zalinski's translation was deficient in that she did not understand a few

Spanish words that most Spanish speakers would know, she refused to translate some of the things that the officers said when they were "talking in code" among themselves, and Carmona could tell even from his limited English that her translation did not capture everything the officers said. Doc. 156-1 at 44-45. A reasonable jury could not infer from that testimony that Zalinski's Spanish was so deficient that she did not adequately convey to Carmona the contents of the consent form.) Investigators smelled gas on the clothing recovered from Carmona, but they did not find gas on the hand swab. Doc. 155 at ¶ 30. (Carmona raises several objections to the factual assertions in this paragraph. His objection that Defendants failed to lay a foundation concerning precisely *when* the physical evidence was found is sustained. *Id*. at ¶ 10; *see Aviles v. Cornell Forge Co.*, 183 F.3d 598, 603 (7th Cir. 1999) (holding that the plaintiff did not show at summary judgment that a supervisor's threat was related to his termination where he adduced no evidence concerning the time the alleged threat was made). It is clear that investigators had collected the evidence at least by January 19, when Dantes used it to obtain a search warrant, Doc. 155 at ¶¶ 67, 73, but Defendants do not support the proposition that the evidence was discovered much before then. Carmona's other objections are overruled. *Id*. at ¶¶ 10, 14, 30. Defendants' assertions are relevant to whether they behaved unconstitutionally or tortiously given the information they had at the time, and the assertions do not mischaracterize the record. The court does not understand Carmona's objection that the assertions are "argumentative" or "speculati[ve]," and as Carmona provides no developed argument or authority to support that objection, it is forfeited. *See M.G. Skinner*, 845 F.3d at 321. And Carmona's denial of Defendants' assertions about the findings from their investigation is disregarded, as he cites only a portion of the transcript from a hearing where the state trial judge described weaknesses in the

state's case against him, Doc. 155 at ¶ 30, and none of the judge's observations contradict Defendants' description of the evidence the detectives recovered from the scene.)

On January 18, Erica told investigators that she saw Carmona pour or shake gas out of a gas can around the time of the fire. *Id*. at ¶ 29. (Carmona's objections to Defendants' description of Erica's statement are overruled. The description does not mischaracterize Erica's statement as it was recounted in the deposition testimony cited by Defendants. Nor is Erica's statement hearsay, as it is offered not for its truth, but for its effect on Defendants. *See Smith v. Lamz*, 321 F.3d 680, 686 n.3 (7th Cir. 2003) (holding that a witness's statement to a police officer accusing the plaintiff of a crime was not hearsay when offered to show that the accusation led the officer to believe the plaintiff had committed that crime). Nor is Defendants' supporting evidence barred by Evidence Rule 1002, which states: "An original writing, recording, or photograph is required in order to prove its content." Fed. R. Civ. P. 1002. Defendants' assertion concerns statements that a witness (Erica) made during an interview, not the content of a writing, recording, or photograph. *See Rodriguez v. Señor Frog's de la Isla, Inc.*, 642 F.3d 28, 34 (1st Cir. 2011) (holding that Rule 1002 did not bar a witness's testimony just because she could have submitted documentary evidence to prove the facts to which she testified); *United States v. Fagan*, 821 F.2d 1002, 1008 n.1 (5th Cir. 1987) (holding that Rule 1002 did not bar a police officer from testifying to the contents of a witness interview, even though the officer taped the interview); *R & R Assocs., Inc. v. Visual Scene, Inc.*, 726 F.2d 36, 38 (1st Cir. 1984) ("[A]s the advisory committee note makes clear, Rule 1002 applies not when a piece of evidence sought to be introduced has been somewhere recorded in writing but when it is that written record itself that the party seeks to prove. … No evidentiary rule … prohibits a witness from testifying to a fact simply because the fact can be supported by written documentation."). Additionally,

Carmona's denial of Defendants' assertions concerning what precisely Erica said during the interview is meritless. Doc. 155 at ¶ 29. Carmona supports his denial by citing only his criminal attorney's argument at a state court hearing, but "[c]ounsel's arguments … are not evidence." *United States v. Austin*, 907 F.3d 995, 1000 n.2 (7th Cir. 2018).)

The investigating detectives relayed information concerning Erica's statement and the physical evidence recovered at the scene to Dantes, who on January 19 used that information to obtain and execute a search warrant on Carmona's car. Doc. 155 at ¶¶ 66-67, 73-75. (Carmona's hearsay objection to this fact is overruled because the detectives' statements to Dantes are offered not for their truth, but to show what information Dantes used to apply for the warrant. *See Cairel v. Alderden*, 821 F.3d 823, 831 (7th Cir. 2016) (holding that witness statements were not hearsay when offered to show why officers believed they had probable cause and what information they passed on to prosecutors).) Dantes had no reason to doubt the information that the investigators gave to him. Doc. 155 at ¶ 68. (Carmona's objections to this fact are overruled: the fact is not speculative, but rather is supported by Dantes's testimony; it is factual, not legal; and Dantes had personal knowledge under Rule 602 of whether he received information calling into question the information given him. Carmona's denial of the fact is disregarded, as his contention that Dantes had an affirmative duty to verify the investigators' information has nothing to do with whether he had reason to doubt that information.) Dantes neither drafted the warrant application nor had personal knowledge of the matters in the application. *Id.* at ¶ 69; Doc. 159 at ¶¶ 112-113. Other detectives and the prosecutor reviewed the application before Dantes submitted it, and the state judge who issued the warrant did not question Dantes about the application. Doc. 159 at ¶ 113. (Carmona's assertion that Dantes did not discuss the warrant's contents with the prosecutor, *ibid.*, is disregarded because it is not

supported by the record material he cites.)  Dantes recovered a gas can from Carmona's car, but no accelerants were found on the can.  Doc. 155 at ¶¶ 75-76.  Dantes documented the search in a police report.  *Id*. at ¶ 77.  He had no further involvement in the acts that Carmona alleges are tortious or unconstitutional.  *Id*. at ¶¶ 78-79.

Upon his release from the hospital, Carmona was brought to a police station, where Garcia and Guzman questioned him again.  *Id*. at ¶ 27.  Detectives later arrested Carmona, believing based on Erica's statement and the physical evidence that there was probable cause to believe that he committed arson and murder.  *Id*. at ¶¶ 27, 30-31.  (Carmona's objection to Defendants' assertion that detectives determined based on physical evidence and Erica's statement that they had probable cause is overruled.  *Id*. at ¶ 30.  Whether the detectives *believed* they had probable cause is a fact, not a legal conclusion, and the assertion does not mischaracterize the testimony cited by Defendants.  Carmona's denial of the assertion is disregarded.  The only evidence he cites is a portion of a transcript where the state judge listed weaknesses in the case against Carmona.  It cannot be inferred from the judge's comments that the officers did not believe there was probable cause to arrest Carmona.)

A police investigator who visited the scene some thirty days after the fire found gang graffiti outside the building.  Doc. 159 at ¶ 102.  No one in the Chicago Police Department investigated whether the fire was gang-related.  *Ibid*.  Dantes later testified that he did not remember whether he or his colleagues considered the possibility that Martinez-Rayo caused the fire.  *Id*. at ¶ 106.

While in pretrial detention, Carmona received medication for depression and sleeplessness.  *Id*. at ¶¶ 34-35.  Doctors prescribed him the medication after noticing signs of depression.  *Id*. at ¶ 36; Doc. 138-2 at 46.  (Defendants' assertion that Carmona was not

diagnosed with depression, Doc. 155 at ¶ 35, is disregarded because Carmona did not state in the cited portion of his deposition that he was *not* diagnosed with depression, Doc. 138-2 at 46, and a reasonable jury could infer from the fact that he took depression medication that he had been diagnosed with depression.)  Carmona did not receive any other treatment.  Doc. 155 at ¶ 35.

Carmona's criminal case proceeded to a bench trial.  *Id.* at ¶ 32.  The judge initially found him guilty of both charges, but later granted a motion to reconsider and acquitted him.  *Id.* at ¶¶ 32-33.  (Carmona's objections to Defendants' assertion concerning the initial guilty verdict, *id.* at ¶ 32, are overruled.  Defendants' assertion is supported by the record, and evidence concerning the guilty verdict is not unfairly prejudicial under Rule 403.  Moreover, in opposing summary judgment, Carmona argues that Defendants' actions were inappropriate because they knew about the weaknesses in the case that would ultimately lead to his acquittal.  *E.g.*, Doc. 154 at 13, 20.  Evidence bearing on whether the acquittal was a close call, including that the trial judge initially found Carmona guilty, is pertinent to evaluating that argument.)  During argument on Carmona's reconsideration motion, the judge emphasized that the strongest evidence that he was the arsonist was Erica's statement, which was both uncorroborated and taken when she was six years old, and that it was difficult to believe that Carmona could have spread the gas without getting any on his hands.  Doc. 159 at ¶ 80.

### Discussion

Following his acquittal, Carmona filed this lawsuit, which alleges violations of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights and the state law torts of malicious prosecution and intentional infliction of emotional distress ("IIED").  Doc. 78.  Dantes, Jones, Orton, Reppen, and Zygowicz—but not Francis, Fanning, Daniel Jacobs, Guzman, Garcia, and

Schall—move for summary judgment on the constitutional and state law malicious prosecution claims, and all Defendants move for summary judgment on the IIED claim. Doc. 137.

## I.    Section 1983 and State Law Malicious Prosecution Claims

### A.    Qualified Immunity (Dantes)

Dantes argues that he is entitled to qualified immunity on the § 1983 claims to the extent they implicate his role in obtaining and executing the search warrant on Carmona's car. Doc. 139 at 10-12. "The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). "Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner … ." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). A plaintiff can overcome qualified immunity despite the officer's reliance on a warrant if "it is obvious that no reasonably competent officer would have concluded that a warrant should issue," but "the threshold for establishing this exception is a high one." *Id.* at 547; *see also Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1060 (7th Cir. 2018) (holding that "even assuming [a] search warrant was not supported by probable cause, the [defendant] officers were entitled to qualified immunity for their conduct in procuring and executing [it]" where the "warrant application was [not] so lacking in indicia of probable cause as to render official belief in its existence unreasonable") (internal quotation marks omitted).

Carmona argues that it was unreasonable for Dantes to rely on the warrant here because (1) "the Judge [did not] ask[ ] Dantes questions about the search warrant," and (2) "Dantes did

not have any personal knowledge of the contents of the search warrant," but rather relied on a warrant application composed by, and based on the observations of, other officers. Doc. 154 at 17. Carmona cites no authority establishing an exception to the principle announced in *Messerschmidt* for circumstances where the issuing judge does not question the officer seeking the warrant or where the officer lacks personal knowledge of the matters in the warrant application, thereby forfeiting both points. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 n.3 (7th Cir. 2008) ("We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority … forfeits the point.") (punctuation omitted).

Even setting forfeiture aside, Carmona's arguments are meritless. As to the first, a reasonably competent officer could conclude on the strength of the evidence presented in a warrant application that the warrant was properly issued even if the issuing judge did not question the officer about the warrant affidavit. *See Messerschmidt*, 565 U.S. at 543 (reversing the district court's denial of qualified immunity, reasoning that "it would not have been entirely unreasonable for an officer to believe that the *facts set out in the affidavit* established a fair probability" that the seizures authorized by the warrant would aid in the defendant's prosecution, with no mention of whether the magistrate questioned the officer about the affidavit) (emphasis added) (internal quotation marks omitted). As to the second, settled law holds that an "officer is entitled to rely on the collective knowledge of all the investigating officers in making out his warrant request." *United States v. Hansmeier*, 867 F.3d 807, 814 (7th Cir. 2017) (internal quotation marks omitted); *see also United States v. Griffin*, 827 F.2d 1108, 1111-12 (7th Cir. 1987) ("Observations of fellow officers of the Government engaged in a common investigation

are plainly a reliable basis for a warrant applied for by one of their number … .") (alteration omitted) (quoting *United States v. Ventresca*, 380 U.S. 102, 111 (1965)).

Dantes is therefore entitled to qualified immunity on the § 1983 claims to the extent they implicate his role in obtaining and executing the search warrant for Carmona's car.

### B. Personal Involvement (Dantes, Jones, Orton, Reppen, and Zygowicz)

Dantes, Jones, Orton, Reppen, and Zygowicz seek summary judgment on the § 1983 and state law malicious prosecution claims (apart from the search-related constitutional claim against Dantes, which is addressed above) on the ground that they neither were personally involved in nor conspired to cause Carmona's interrogation, investigation, handcuffing, arrest, and prosecution. Doc. 139 at 4-10.

A defendant who engages in a conspiracy to violate constitutional rights can be held liable for acts of co-conspirators. *See Geinosky v. City of Chicago*, 675 F.3d 743, 749-50 (7th Cir. 2012). "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance [of the conspiracy] actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Id*. at 511.

Absent a conspiracy, a government employee is liable under § 1983 only if the plaintiff proves the employee's "personal involvement in the alleged constitutional deprivation … [and] demonstrate[s] a causal connection between (1) the sued officials and (2) the alleged misconduct." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (citation and internal quotation marks omitted). Likewise, "[t]o establish a claim for malicious prosecution under

Illinois law, plaintiffs must establish … commencement or continuation of an original proceeding by the defendant." *Id.* at 654-55 (brackets omitted). A defendant "commences or continues" a malicious prosecution if her "conduct is both the cause in fact and a proximate cause of the commencement or continuation of the original criminal proceedings." *Beaman v. Freesmeyer*, __ N.E.3d __, 2019 WL 470186, *9 (Ill. Feb. 7, 2019).

Here, the complaint alleges that Defendants violated Carmona's constitutional rights and engaged in malicious prosecution by: (1) interrogating him at the hospital and after his release, Doc. 78 at ¶¶ 15, 18-26, 28; (2) handcuffing him to his hospital bed, *id.* at ¶ 16; (3) searching his car, *id.* at ¶¶ 29-31; (4) arresting him, *id.* at ¶¶ 27, 32-33, 37-43; and (5) causing his prosecution for murder, *id.* at ¶¶ 34, 66-72. Carmona further alleges that Defendants conspired with one another to violate his constitutional rights and to maliciously prosecute him. *Id.* at ¶¶ 49-53. To avoid summary judgment as to a particular defendant, Carmona must adduce evidence from which a reasonable jury could find *either* that the defendant's actions caused at least one of the alleged violations *or* that the defendant conspired with someone who was personally involved in at least one of the violations. Carmona has not met that burden as to Dantes, Jones, Orton, Reppen, or Zygowicz.

First, no reasonable jury could find on the summary judgment record that Dantes, Jones, Orton, or Reppen conspired against Carmona. To support his view that there was such a conspiracy, Carmona observes that those defendants "were collectively (and with other officers) assigned to participate in the investigations … that occurred on January 16, 2013," and that he was arrested, jailed, and tried for murder based on the evidence recovered in the investigation. Doc. 154 at 11. But to prove conspiracy, Carmona must show not merely that Defendants were part of an investigation that resulted in the alleged constitutional and state law violations, but that

they made an *agreement* to commit those violations. *See Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) ("Even if, as Daugherty contends, Harrington and Page knew that he never made the remarks alleged in the disciplinary report, these facts do not support the existence of an agreement between them to violate Daugherty's constitutional rights."); *Owens v. Evans*, 878 F.3d 559, 565 (7th Cir. 2017) (holding that evidence that several prison officials repeatedly denied the plaintiff's grievances was insufficient to show that they "agreed expressly or tacitly to interfere with his pursuit of grievances and lawsuits"); *Cooney v. Casady*, 735 F.3d 514, 518 (7th Cir. 2013) (rejecting the plaintiff's argument that a conspiracy can be proved merely by showing "that the participants share a general conspiratorial objective," and holding that "assert[ions] that there was knowledge and opportunity" for the defendants to collude and "a possibility that [the defendants] *could* have contacted" one another were insufficient to show agreement) (internal quotation marks omitted). There is no evidence in the summary judgment record from which such an agreement can be inferred, and thus no reasonable jury could find that Dantes, Jones, Orton, or Reppen were part of a conspiracy.

Whether a jury could find that Zygowicz was involved in a conspiracy presents a slightly closer question, as Carmona adduces evidence that Zygowicz stood outside the door of his hospital room during the interrogation and stopped Raymundo from entering. Doc. 155 at ¶ 52; Doc. 159 at ¶ 91. But that is where the evidence of conspiracy ends: Zygowicz had no part in the interrogation, and he ended up at the hospital only because he was asked to follow his partner Zalinski there so that Zalinski could translate for Carmona. Doc. 155 at ¶¶ 50-51. There is no evidence that Zygowicz spoke with the interrogators before Zalinski entered the hospital room, and Zygowicz stayed outside the room until Zalinski finished translating. *Id*. at ¶ 52. Even if a jury inferred that one of the interrogators told Zygowicz to turn away visitors, that inference

would be inert, as an interrogating officer naturally would not want her interrogation of a key witness interrupted. It thus would cross the line from reasonable inference to impermissible speculation to assume just from Zygowicz's post outside Carmona's hospital room that he agreed to facilitate the alleged constitutional violations inside. *See House v. Belford*, 956 F.2d 711, 721-22 (7th Cir. 1992) (holding that a reasonable jury could not infer from the fact that a prosecutor ordered a deputy to prevent the plaintiff's wife and others from entering the courtroom during part of the proceedings that the prosecutor was involved in a conspiracy to deprive the plaintiff of a fair hearing).

Thus, Carmona can forestall summary judgment only if he shows that Dantes, Jones, Orton, Reppen, or Zygowicz themselves caused a constitutional violation or the prosecution. Each officer's role in the investigation is undisputed. Dantes obtained and executed the warrant to search Carmona's car, canvassed gas stations and local businesses asking if anyone recently purchased or filled a gas can, and spoke with a nurse to check on Carmona's condition. Doc. 155 at ¶¶ 66-67, 70-79; Doc. 159 at ¶¶ 103, 113, 114. Jones assisted the fire department at the scene, interviewed tenants, bystanders, and Carmona, and prepared two police reports. Doc. 155 at ¶¶ 43, 45-48. Orton read the reports and ensured that the case was correctly classified as an aggravated battery and arson based on the facts therein. *Id.* at ¶¶ 61-64. Reppen assigned detectives to the case the night of the fire, spoke with detectives and fire department personnel and supervised other officers at the scene, authored part of the major incident report, and relayed the investigation's status to the next shift supervisor. *Id.* at ¶¶ 55-60; Doc. 159 at ¶¶ 94, 96, 99. And Zygowicz guarded the crime scene's perimeter, and later stood outside the door to Carmona's hospital room while Zalinski translated during the interrogation. Doc. 155 at ¶¶ 50-52; Doc. 159 at ¶ 91.

The parties agree that none of those officers arrested Carmona, interrogated or handcuffed him, or recommended his prosecution. Yet Carmona argues that those acts were *caused* by Jones because the reports he authored were the "foundation of the investigation"; by Reppen because he contributed to the investigation by writing part of a different report; by Orton because he "caus[ed] the investigation to be classified as an arson and homicide"; and by Dantes because he "had a role in the investigation and conspiracy" and was "involve[d] in obtaining a search warrant." Doc. 154 at 4-15.

The trouble with Carmona's argument is that he adduces no evidence from which a reasonable jury could infer those causal links. Nothing in the summary judgment record supports the notion that, but for Jones's or Reppen's reports, Orton's sign-off on how the investigation was classified, or Dantes's canvassing efforts, Carmona would not have been arrested, interrogated, handcuffed, searched, or prosecuted. Nor could a jury reasonably infer that Dantes's role in obtaining and executing the warrant caused the complained-of acts. The most significant item Dantes found during the search was a gas can on which no trace of accelerants was detected. Doc. 155 at ¶¶ 75-76. Carmona offers no evidence that anyone involved in the investigation or prosecution considered the gas can incriminating, let alone that it played a causal role in any of the alleged constitutional or state law violations. Therefore, no reasonable jury could infer from their relatively minor involvement in the investigation that Jones, Orton, Reppen, or Dantes caused the alleged constitutional violations or Carmona's prosecution. *See de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 564 (7th Cir. 2019) (affirming summary judgment against two defendants under § 1983 where, "other than noting that they were each actors at different points in the personnel investigation, plaintiff did not develop any arguments about their personal involvement in the decision to discharge him"); *Estate of Perry v.*

*Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017) ("Corrections Officer Jeff's involvement was limited to retrieving the AED device that was used to render emergency care to Perry. She then returned to her post in the booking room. … [T]his minimal involvement is not sufficient to invoke liability.").

As to Zygowicz, Carmona argues that he reasonably believed from Zygowicz's position outside the hospital room that he was not allowed to leave, and therefore that Zygowicz's actions in guarding the door effected a seizure. Doc. 154 at 7-8. But an officer does not effect a seizure merely by standing near an exit while other officers conduct questioning. *See United States v. Drayton*, 536 U.S. 194, 205 (2002) ("Officer Hoover's position at the front of the bus [while his partner questioned passengers] … does not tip the scale in … favor [of a seizure]. Hoover did nothing to intimidate passengers, and he said nothing to suggest that people could not exit and indeed he left the aisle clear."); *I.N.S. v. Delgado*, 466 U.S. 210, 217-18 (1984) (rejecting the proposition that "stationing of agents near the doors" while other agents questioned workers "meant that departures were not to be contemplated, and thus, workers were not free to leave," and holding that the workers were not seized) (internal quotation marks omitted); *United States v. Douglass*, 467 F.3d 621, 624 (7th Cir. 2006) ("[O]fficers' stance on either side of Douglass's car [did not] convert the encounter into a seizure … ."). Carmona submits no evidence suggesting that Zygowicz blocked the door or gave Carmona any other indication that he would prevent Carmona from leaving. Thus, Zygowicz did not seize Carmona.

Carmona contends that Jones, Orton, Reppen, Dantes, and Zygowicz are liable for malicious prosecution because they did not adequately investigate alternative suspects or theories—specifically, the possibility that Martinez-Rayo herself set the fire, or that the gang graffiti signaled gang involvement. Doc. 154 at 13. To accept that argument, the court would

have to hold that officers playing even minor roles in an investigation can be held liable for malicious prosecution for failing to take it upon themselves to investigate relatively weak leads, like the remote possibility that a decedent self-immolated or that graffiti found about a month after the fire signaled gang involvement. As Carmona cites no authority for the proposition that a malicious prosecution claim lies on those facts, thereby forfeiting the point, *see M.G. Skinner*, 845 F.3d at 321, the court declines to adopt his unlikely theory of liability.

Next, Carmona argues that even if Reppen is not responsible for the constitutional violations based on his *own* involvement in the investigation, he is responsible for the violations of the officers he supervised. Doc. 154 at 9-10. But the mere fact that Reppen supervised part of the investigation does not make him liable under § 1983 for his subordinates' misconduct, as the *respondeat superior* doctrine does not apply to § 1983 claims. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). "Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable." *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (brackets omitted). Rather, to be held liable under § 1983, "supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Ibid.*; *see also Sides v. City of Champaign*, 496 F.3d 820, 827 (7th Cir. 2007) (similar). No evidence in the summary judgment record indicates that Reppen had any inkling that the alleged constitutional violations—or any alleged malicious prosecution—were taking place, let alone that he facilitated, approved, or condoned them. Therefore, even if one or more detectives under his command participated in the alleged violations, Reppen cannot be held liable for their actions. *See Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (affirming dismissal of § 1983 claims against a supervisor where there was "no allegation or

plausible inference that [the supervisor] knew about or was personally involved in the specific conduct"); *Hinkle v. White*, 793 F.3d 764, 768 (7th Cir. 2015) ("While Oliverio [supervised and] participated in portions of the investigation, [the plaintiff] did not [show personal involvement because he did not] present any evidence that Oliverio facilitated, approved of, or condoned [the alleged constitutional violations].").

Finally, Carmona emphasizes that Jones and Reppen received training in Fourth Amendment law and appropriate police procedure. Doc. 159 at ¶¶ 89, 97. But it cannot be inferred from that training that they knew that their fellow officers were breaking the law or that their actions contributed to any constitutional violations or malicious prosecution. *See J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003) (holding that it could not be inferred from the fact that state child welfare employees were required by law to ensure the well-being of children in foster homes that the employees were personally involved in child abuse perpetrated by foster parents).

Dantes, Jones, Orton, Reppen, and Zygowicz are therefore entitled to summary judgment on the § 1983 and state law malicious prosecution claims.

## II. Intentional Infliction of Emotional Distress Claim

"In order for a plaintiff to prevail under Illinois law in a tort action for [(IIED)], she must demonstrate that: (1) the defendant's conduct was extreme and outrageous, (2) the defendant either intended that his conduct would inflict severe emotional distress, or knew there was a high probability that his conduct would cause severe emotional distress, and (3) the defendant's conduct in fact caused severe emotional distress." *Zoretic v. Darge*, 832 F.3d 639, 645 (7th Cir. 2016) (citing *Doe v. Calumet City*, 641 N.E.2d 498, 506 (Ill. 1994)). Carmona alleges that

Defendants committed IIED by searching his car, causing his prosecution, and interrogating, handcuffing, and arresting him. All Defendants move for summary judgment on the claim.

As shown above, Zygowicz, Orton, Jones, and Reppen did not meaningfully participate in the search of Carmona's car, and neither they nor Dantes meaningfully participated in his interrogation, handcuffing, arrest, or prosecution. Carmona cites no authority and makes no argument for the proposition that they can nevertheless be liable for IIED for those acts, thereby forfeiting the point. *See M.G. Skinner*, 845 F.3d at 321. Zygowicz, Orton, Jones, Reppen, and Dantes are therefore entitled to summary judgment on the IIED claim. (Dantes was personally involved with the vehicle search, but that involvement cannot predicate an IIED claim for the reasons discussed below.)

Francis, Fanning, Jacobs, Guzman, Garcia, and Schall argue that no reasonable jury could find their conduct extreme and outrageous for purposes of the IIED tort. "For conduct to be extreme and outrageous it must go beyond all bounds of decency and be considered intolerable in a civilized community." *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (internal quotation marks omitted). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are not extreme or outrageous. *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 623 (7th Cir. 1989). "Illinois courts generally consider three non-exclusive factors to decide whether conduct is objectively extreme and outrageous in particular cases":

> First, courts examine the degree of power or authority the defendant holds over the plaintiff. This factor carries greater weight where an encounter is atypically severe for the situation, such as where a police officer berates a sexual assault victim instead of assisting the victim and the victim's endangered children. *E.g.*, *Doe*[, 641 N.E.2d at 507-08]. Second, courts consider whether the defendant knew the plaintiff was particularly susceptible to emotional distress and acted inappropriately despite that knowledge. Third, courts consider whether the defendant reasonably believed that his objective was legitimate; greater latitude is given to a defendant pursuing a reasonable objective even if that pursuit results in some amount of distress for a plaintiff.

Police officers, for example, are entitled to perform their law enforcement responsibilities assertively.

*Cairel*, 821 F.3d at 835 (citations omitted).

A reasonable jury could find on the summary judgment record that the hospital interrogation of Carmona by Fanning, Schall, Francis, Garcia, and Guzman was extreme and outrageous. (Defendants do not distinguish among those five officers or argue that the IIED claim against some of them should be dismissed even if the claim proceeds against others, Doc. 139 at 15 (discussing all five officers together), thereby forfeiting any such argument. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue … .").) Crucially, there is no indication in the record that any of the evidence against Carmona had been unearthed when the interrogation occurred, and Defendants concede that Carmona was considered a victim, not a suspect, at that time. Doc. 155 at ¶¶ 15-16, 46; Doc. 159 at ¶ 107-108. Yet (resolving all genuine fact disputes in Carmona's favor) one of the officers threatened to imprison Carmona for life, while Garcia encouraged him to confess to arson and murder in exchange for a lower sentence, accused him of trafficking drugs, and got so close to him that he feared for his physical safety. Doc. 159 at ¶ 108. In other words, the officers accused Carmona of killing his girlfriend and endangering their daughter, threatened him with life in prison, and generally treated him with suspicion and disrespect, even though they did not believe—and had not yet obtained any evidence to suggest—that he was the arsonist.

A reasonable jury could find that conduct extreme and outrageous under the three-factor standard cited above. The first factor, whether the defendant abused a position of power, points

toward extreme and outrageous behavior. Police officers indisputably occupy a position of authority, *see McGrath v. Fahey*, 533 N.E.2d 806, 809-10 (Ill. 1988) ("[P]olice officers … [are] examples of the many types of individuals who may be positioned to exercise power or authority over a plaintiff."), and Carmona's hospitalization and inability to leave without compromising his health magnified that power, *see Lopez v. City of Chicago*, 464 F.3d 711, 721 (7th Cir. 2006) (holding that police officers occupied an especially powerful position when the plaintiff was detained in an interrogation room). Defendants allegedly abused their position: They accused Carmona, a crime victim suspected of no wrongdoing, of setting his own apartment on fire with his girlfriend and child inside and threatened to incarcerate him for the rest of his life. That conduct is "atypically severe for the situation" and "far out of bounds" of appropriate police behavior. *Cairel*, 821 F.3d at 836-37. Comparable treatment of crime victims has been held extreme and outrageous, and rightly so. *See Fox*, 600 F.3d at 842 (holding that an officer's profanity-laced tirade against the mother of a recently murdered daughter was extreme and outrageous, reasoning that the officer "held [the mother's] family life in the balance and he exploited his position of power to intentionally cause her distress"); *Doe*, 641 N.E.2d at 507-08 (holding that a police officer behaved in an extreme and outrageous manner when he "questioned [a sexual assault victim] in [a] rude, demeaning, and accusatory manner … [,] asked inappropriate questions, such as 'Why did you leave your children in the apartment if there was a strange man there?'"). Defendants emphasize that Erica was allowed to remain in Carmona's hospital room for part of the interrogation and that the officers called in a translator, Doc. 139 at 15-16, but those facts are insufficient to mitigate the severity of the conduct alleged.

The second factor, whether the defendant knew the plaintiff was particularly susceptible to emotional distress, also points toward extreme and outrageous behavior. Carmona had

recently escaped a fire that threatened his and his daughter's lives and that killed his girlfriend. Police officers are presumed to know that crime victims and those who have lost loved ones are emotionally vulnerable. *See Fox*, 600 F.3d at 842 (holding that a police officer interrogating a murdered child's parents about the murder knew that "the mother of a recently murdered child … was particularly susceptible to emotional distress"); *Doe*, 641 N.E.2d at 507-08 (holding that it was "reasonable to infer that [a defendant police officer] knew that [the plaintiff] was in an emotional state that would make her susceptible to severe emotional distress" where "she had only recently escaped a sexual assault"). A reasonable jury could find that Defendants knew that Carmona was particularly sensitive emotionally when they questioned him at the hospital.

The third factor, whether Defendants reasonably believed they were acting in service of a legitimate objective, also points toward extreme and outrageous behavior. Again, Defendants considered Carmona a victim, not a suspect, when they questioned him at the hospital. Police officers do not have a legitimate interest in accusing a crime victim of committing an offense, nor do they have an interest in threatening that victim or treating him with disrespect. *See Doe*, 641 N.E.2d at 395 (holding that an officer's "conduct [was] not ameliorated by any reasonable belief he was pursuing a legitimate objective" because his rude and demeaning "treatment of [a sexual assault victim] was not necessary to determine appropriate police response").

A reasonable jury also could find that Fanning's, Schall's, Francis's, Garcia's, and Guzman's behavior at the hospital satisfied the other two elements of an IIED claim. As to the second element, intent, Defendants concede that "[i]f conduct is indeed extreme and outrageous, it is almost certain that the defendant was aware such extreme and outrageous behavior would lead to emotional distress." Doc. 139 at 17. A reasonable jury could draw that inference here. Likewise, "the extreme and outrageous character of the defendant's conduct is in itself important

evidence" of the third element, that the emotional distress suffered by the plaintiff was severe. *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 213 (Ill. 1992); *see also Honaker v. Smith*, 256 F.3d 477, 497 (7th Cir. 2001) (holding that a district court erred in failing to consider "whether the severity of the alleged conduct … permitted the reasonable inference that [the plaintiff's] distress" satisfied the third element); *Bristow v. Drake St. Inc.*, 41 F.3d 345, 350 (7th Cir. 1994) ("[Illinois IIED] cases … tend to merge the issue of the outrageousness of the defendant's conduct with the issue of the severity of the plaintiff's emotional distress, in effect requiring more evidence of outrageousness the weaker the evidence of distress."). Here, a reasonable jury could find that the interrogating officers falsely accused Carmona of murdering a recently-deceased loved one and threatened him with life imprisonment. Almost anyone in that situation would experience profound emotional distress. Combined with other evidence that Carmona was later prescribed depression medication, Doc. 155 at ¶¶ 34-36, a reasonable jury could find that Carmona experienced severe emotional distress.

Defendants argue in the alternative that they are immune for their conduct in the hospital room under the Illinois Tort Immunity Act ("TIA"), which provides that an officer acting in her official capacity is immune from tort liability unless she engages in "willful and wanton conduct," 745 ILCS 10/2-202, meaning "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property," 745 ILCS 10/1-210. Defendants raise essentially the same arguments in seeking TIA immunity that they press in addressing the merits of the IIED claim, Doc. 139 at 20-21 (citing their IIED argument in seeking immunity), emphasizing that even if a reasonable jury could find that their actions were not objectively justified, it nonetheless would have to conclude that Defendants were making a reasonable, good

faith effort to do their jobs and did not intend to harm Carmona, *id*. at 21. Those arguments fail. For the same reasons that a jury could find the officers during the hospital room interrogation behaved in an extreme and outrageous manner and intended to cause severe emotional distress, a jury could find that the officers acted with "an actual or deliberate intention to cause harm." 745 ILCS 10/2-202; *see Doe v. Calumet City*, 641 N.E.2d 498, 506 (Ill. 1994) (holding that an officer who committed IIED was not immune under the TIA); *Tyagi v. Sheldon*, 2017 WL 4130532, at *20 (N.D. Ill. Sept. 18, 2017) (analyzing an IIED claim and TIA immunity together); *Lark v. City of Evanston*, 2017 WL 413615, at *6 (N.D. Ill. Jan. 31, 2017) (same). Thus, the officers are not immune from IIED liability under the TIA.

In sum, a reasonable jury could find Fanning, Schall, Francis, Garcia, and Guzman liable for IIED based on the hospital interrogation, and thus their summary judgment motion is denied as to that component of Carmona's claim. After the hospital room interrogation, however, Defendants discovered significant evidence implicating Carmona in the arson and murder—most notably, Erica's statement that she saw Carmona pouring gas out of a gas can, and physical evidence suggesting that the arsonist used gas from a gas can as an accelerant. Doc. 155 at ¶¶ 29-30. Defendants' actions following those discoveries—including interrogating Carmona at the police station, searching his car, and causing his prosecution—were not extreme and outrageous. Starting with the first outrageousness factor, interrogating, searching, and aiding in the prosecution of a suspect against whom there is significant evidence is not "far out of bounds" of appropriate police behavior; to the contrary, it is well within the scope of "ordinary [police] tactics." *Cairel*, 821 F.3d at 836 (holding that police officers did not abuse their power in using ordinary interrogation tactics to question a suspect); *see also Bailey v. City of Chicago*, 779 F.3d 689, 697 (7th Cir. 2015) (holding than an officer's conduct in handcuffing the plaintiff to the

wall when no other officer was present was not extreme or outrageous, where the practice was standard police procedure). True, police misconduct in carrying out an otherwise unobjectionable investigation may be extreme and outrageous, *see Bianchi v. McQueen*, 58 N.E.3d 680, 700 (Ill. App. 2016) (holding that the extreme and outrageous factor was satisfied where "plaintiffs alleged that defendants fabricated and manufactured evidence and concealed exculpatory evidence for the purpose of falsely and maliciously detaining, arresting, and charging plaintiffs, knowing that such charges lacked probable cause"), even if the officers believe the suspect is guilty, *see Lopez*, 464 F.3d at 721 (holding that using severe physical deprivation to coerce a murder suspect's confession was extreme and outrageous), but no such misconduct is alleged here.

The third factor, whether the officer reasonably believed she was acting in furtherance of a legitimate interest, also weighs against outrageousness. The mere fact that an officer wrongly accused the plaintiff or exceeded her authority does not satisfy this factor. *See Stokes v. Bd. of Educ. of Chi.*, 599 F.3d 617, 626 (7th Cir. 2010) ("Principal Banks' actions to secure the arrest of plaintiffs based on probable cause, designed to restore order to a public school, did not come close to being truly extreme and outrageous, even though he was mistaken about these plaintiffs' roles in the disturbance.") (internal quotation marks omitted); *Dunn v. City of Elgin*, 347 F.3d 641, 651 (7th Cir. 2003) ("Although the officers were unreasonable in their belief that they had authority to enforce the court order [authorizing seizure of a fifteen-month-old child from her mother], this represents negligent or reckless conduct and does not alone amount to intentionally extreme and outrageous conduct."). Here, given the significant evidence against Carmona, the officers acted pursuant to a legitimate interest in investigating his involvement in the arson and murder, even though he was ultimately acquitted.

As for the second factor, Defendants knew that Carmona remained emotionally vulnerable in the days and weeks following the murder. But it is not extreme or outrageous to inflict emotional pain on a vulnerable person in service of a sufficiently legitimate objective. *See Franciski v. Univ. of Chi. Hosps.*, 338 F.3d 765, 769 (7th Cir. 2003) (holding that the defendant hospital did not act in an extreme and outrageous manner by limiting the plaintiffs' visits to their baby in the pediatric intensive care unit ("PICU"), given that the limitations were "legitimate efforts to maintain order in the PICU by removing [the plaintiffs] when they refused to calm down"); *Knysak v. Shelter Life Ins. Co.*, 652 N.E.2d 832, 839 (Ill. App. 1995) (noting that "[a] person will not be liable where he has done nothing more than demand legal rights in a permissible way, although aware that such demand is likely to cause emotional distress," and holding that it was not extreme and outrageous for an insurer to send an insured a letter informing him that no coverage was available for his wife's serious illness); *Gibson v. Chem. Card Servs., Corp.*, 510 N.E.2d 37, 41-42 (Ill. App. 1987) (holding that an employer did not act in an extreme and outrageous manner by accusing an employee of theft and giving her name to the Secret Service, reasoning that the employer "had a legitimate interest in solving prior employee thefts and preventing future thefts … [and in] assist[ing] the Secret Service in its investigation of such thefts" and that "such investigations cannot be conducted without creating some distress"). On balance, in light of Defendants' legitimate interest in solving the murder-arson, no reasonable jury could find that it was extreme or outrageous for them to take the measures necessary to investigate and ultimately prosecute a suspect against whom there was significant evidence, despite his emotional fragility.

Carmona argues that Defendants' actions were not justified by a legitimate law enforcement interest because the evidence against him was weak. In support, Carmona points to

the state judge's statements during a hearing on the reconsideration motion, where she emphasized that while there was ample evidence of arson, the only evidence tending to show that he was the arsonist was the uncorroborated statement of six-year-old Erica. Doc. 154 at 20. But Carmona's acquittal was a close call even for the judge, as she convicted Carmona initially and only later changed her mind. Doc. 155 at ¶¶ 32-33. And while law enforcement should certainly exercise caution in soliciting and relying on a young child's statements, it is not far out of bounds for officers to consider those statements when evaluating whether there is probable cause for a search, arrest, or prosecution. *See United States v. Clark*, 668 F.3d 934, 940 (7th Cir. 2012) (holding that a judge properly considered an affidavit describing a six-year-old's testimony in deciding whether there was probable cause to search the defendant's computer); *see also Harris v. Thompson*, 698 F.3d 609, 633 & n.13 (7th Cir. 2012) (observing that "Illinois courts have often allowed very young children to testify" at criminal trials, and collecting cases involving four-, five-, and six-year-old witnesses). In short, no reasonable jury could find in the circumstances of this case that it was extreme and outrageous for the officers to rely on Erica's statement. Defendants are therefore entitled to summary judgment on Carmona's IIED claim to the extent it is predicated on the car search, the police station interrogation, and his prosecution.

Two incidents remain on which an IIED claim could be grounded: first, the incident in the hospital where an unnamed firefighter asked Carmona hostile, accusatory questions about the fire; and second, when Carmona was handcuffed to his hospital bed. Doc. 155 at ¶¶ 21-22; Doc. 159 at ¶ 107. There is no evidence in the record from which a jury could infer that any Defendant participated in, witnessed, or even knew about either incident. Carmona makes no argument and cites no authority suggesting that Defendants are nonetheless liable for those actions, thereby forfeiting the point. *See M.G. Skinner*, 845 F.3d at 321. Therefore, Defendants

are entitled to summary judgment as to the IIED claims based on the firefighter's questions and the handcuffing incident.

Finally, although no party discusses with any specificity Jacobs's role in the investigation, Defendants moved for summary judgment on the IIED claim against "all [D]efendants" on the ground that there is no evidence in the record that any of them acted in an extreme or outrageous manner, Doc. 139 at 12-13, and Carmona adduces no evidence of extreme or outrageous behavior on Jacobs's part. Jacobs is therefore entitled to summary judgment on the IIED claim. *See Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014) ("Because [the plaintiff] bears the ultimate burden of persuasion, [the defendant's] summary judgment burden may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [the plaintiff's] case."), *overruled in other part by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).

In sum, material factual disputes preclude summary judgment as to the IIED claim against Fanning, Schall, Francis, Garcia, and Guzman based on the hospital room interrogation, but Defendants otherwise are entitled to summary judgment on the claim.

### Conclusion

Defendant's summary judgment motion is denied as to the IIED claim against Fanning, Schall, Francis, Garcia, and Guzman insofar as it is predicated on the hospital room interrogation. That claim—along with the constitutional claims against Fanning, Schall, Francis, Garcia, Guzman, and Jacobs, on which Defendants do not seek summary judgment—shall proceed to trial. The motion is granted as to all claims against Jones, Orton, Reppen, Zygowicz, and Dantes; as to the IIED claim against Jacobs; and as to the IIED claim against Fanning,

Schall, Francis, Garcia, and Guzman except insofar as it is predicated on the hospital room interrogation.

September 3, 2019

_____
United States District Judge